James MATHIS; Ronald Hassard; Allen Schofield; Laborers' International Union of North America, Local 1464; International Brotherhood of Electrical Workers, Local 639, Plaintiffs–Appellants,

v.

PACIFIC GAS AND ELECTRIC COMPANY; Nuclear Regulatory Commission, an Agency of the United States of America, Defendants–Appellees.

No. 87–6172.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 9, 1989.

Decided Dec. 20, 1989.

Barrett S. Litt, Los Angeles, California, for the plaintiffs-appellants.

Carl E. Hayes, San Luis Obispo, California, for the appellee Pacific Gas and Electric Company.

George Wu, Assistant United States Attorney, Los Angeles, California, for the Nuclear Regulatory Commission.

Before CANBY, WIGGINS and O'SCANNLAIN, Circuit Judges.

CANBY, Circuit Judge:

The plaintiffs, James Mathis, Ronald Hassard, Allan Schofield, Laborers International Union of North America, Local 1464, and International Brotherhood of Electrical Workers, Local 639, appeal the district court's decision dismissing their civil rights action against Pacific Gas and Electric ("PG & E") and the Nuclear Regulatory Commission ("NRC") for lack of subject matter jurisdiction. We reverse in part and affirm in part.

The individual plaintiffs are employees of contractors who perform work for PG & E at the Diablo Canyon Nuclear Power Plant ("Diablo Canyon"). Also included as plaintiffs are two labor unions representing similarly situated contractors' employees. Two of the individual plaintiffs were denied access to Diablo Canyon by PG & E be-

cause they had failed psychological tests. A third was denied access because he was suspected of illegal drug use or sales. None of the plaintiffs was afforded a hearing. As a result of being denied access, all three lost their jobs with PG & E contractors.

Plaintiffs alleged that denial of access by PG & E without a hearing violated their rights to due process of law. They sought damages and injunctive relief against PG & E. They also sought declaratory and injunctive relief against the NRC requiring the NRC to set standards for the denial of access by nuclear licensees, and to require hearings for contractors' employees who were barred from nuclear facilities.

Both defendants moved for dismissal of the complaint for lack of subject matter jurisdiction. PG & E contended that its actions were not those of the state or federal government, and that plaintiff's complaint therefore presented no federal question. The NRC contended that the Congress had not authorized such an action in district court, and that plaintiffs had failed to exhaust the remedies provided by the NRC's own administrative process. After permitting the plaintiffs to amend their complaint twice, the district court granted both the defendants' motions to dismiss. The plaintiffs brought a timely appeal to this court. We have jurisdiction under 28 U.S.C. § 1291.

GOVERNMENTAL ACTION: PG & E

1. *Procedural Posture of this Case.*

The district court dismissed plaintiffs' action against PG & E for lack of subject matter jurisdiction, on the ground that PG & E's activities that were the subject of the complaint involved no state or federal action sufficient to raise a federal question. The complaint, however, clearly alleged that PG & E acted under color of state law, and that it acted as the agent, or at the instance, of the NRC. Dismissal for lack of jurisdiction was accordingly proper only if the claim of governmental action was "wholly insubstantial and frivolous." *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). We review the dismissal "favorably viewing the facts al-

leged to support jurisdiction." *Boettcher v. Secretary of Health and Human Services,* 759 F.2d 719, 720 (9th Cir.1985).

### 2. *State Action.*

■ The district court's ruling that the complaint raised no substantial claim of state action was correct. Indeed, plaintiffs scarcely argue the point on appeal. Their claim of state action is essentially confined to allegations that PG & E is a public utility subject to extensive state regulation. That fact, without more, is insufficient to infuse its conduct with state action. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)[1]. The complaint therefore raised no colorable claim under 42 U.S.C. § 1983.

### 3. *Federal Action.*

Closer questions are raised by plaintiffs' contention that PG & E's denial of access was sufficiently infused with federal action to support a federal claim under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). To evaluate the merits of this argument, it is necessary to examine the allegations in some detail, and to differentiate among the individual plaintiffs.

■ Plaintiffs Hassard and Schofield were denied access to Diablo Canyon plant because they had "failed" a written psychiatric evaluation known as the Minnesota Multiphasic Personality Inventory ("MMPI"), which had been administered by PG & E. Plaintiffs contend that PG & E's action was federal because it was a response to coercion and encouragement by the NRC.

In 1984, the NRC issued as a proposed rule an "Access Authorization Program," 49 Fed.Reg. 30726 (1984), which would have required nuclear power plant licen-

sees to undertake background investigations and psychological testing of all employees (including contractors' employees) seeking access to protected areas of nuclear power plants. Programs were to be designed in accordance with guidelines and objectives announced by the NRC. Among the required steps to be taken by licensees was a "psychological assessment" consisting of "(1) [w]ritten personality tests, and (2) a clinical interview by a qualified psychologist or psychiatrist for individuals whose personality test results are either inconclusive or indicate abnormal personality traits." *Id.* at 30728.

Although this program was proposed as a rule by the NRC prior to the denial by PG & E of access to plaintiffs Hassard and Schofield, no final rule was adopted prior to the denial and their subsequent discharges from employment.[2] Plaintiffs contend, however, that the policy of NRC was to encourage and pressure licensees into adopting the proposed procedures. These urgings, according to plaintiffs, constitute "such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982).

We accept for purposes of decision the contention of plaintiffs that they have adequately alleged that the NRC rule was actually applied to PG & E despite its lack of formal adoption. We conclude, however, that even this assumption fails to supply the necessary nexus between the actions of the NRC and PG & E's decision to deny access to plaintiffs Hassard and Schofield because of their psychological test results.

The controlling principles were set forth by the Supreme Court in *Blum v. Yaretsky,* 457 U.S. at 991, 102 S.Ct. at 2777. In *Blum,* plaintiffs were patients residing in private nursing homes who challenged deci-

---

**1.** It is equally clear that PG & E is not exercising powers "traditionally the exclusive prerogative of the State" so as to become a state actor under the "public function" test. *Jackson,* 419 U.S. at 353, 95 S.Ct. at 454–55.

**2.** In 1988, the Commission issued a policy statement setting forth guidelines proposed by the

industry as an alternative to its proposed 1984 rule. Nuclear Power Plant Access Authorization Program; Policy Statement, 53 Fed.Reg. 7534 (1988). Recently, the NRC has called for public comment on the proposed industry guidelines. Nuclear Power Plant Access Authorization Program, 54 Fed.Reg. 19388 (1989).

sions of the staffs of those homes to discharge the plaintiffs or transfer them to facilities with a different level of care, without notice or hearing. To establish state action, plaintiffs relied on state regulations requiring licensed homes to assure that Medicaid care offered to patients was medically necessary, and to make efforts to transfer patients to the appropriate level of care as required by their medical condition. Plaintiffs also relied on penalties imposed by the state on facilities that supplied care substantially in excess of that necessary.

The Supreme Court found no state action because the actual transfer decision was not attributable to the state.

> These regulations do not require the nursing homes to rely on the [state-specified] forms in making discharge or transfer decisions, nor do they demonstrate that the state is responsible for the decision to discharge or transfer particular patients. Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State.

*Blum,* 457 at 1008, 102 S.Ct. at 2788. Thus there is no state, or federal[3], action unless the transfer or discharge is "made on the basis of some rule of decision for which the State is responsible." *Rendell–Baker v. Kohn,* 457 U.S. 830, 843, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) (White, Jr., concurring in *Rendell–Baker* and *Blum*). The requisite nexus to the government is absent when the decisions are "based on *independent professional judgments* and were not subject to state direction." *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 2257 n. 10, 101 L.Ed.2d 40 (1988); *see also Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (public defender representing a client does not act under color of state law).

These principles control the cases of plaintiffs Hassard and Schofield here. The proposed rule that is offered to show governmental direction of the decision to deny them access does not dictate a decision, nor the standards for decision. *Access Authorization Program,* 49 Fed.Reg. at 30728. Most important, the proposed rule specifies that individuals whose test results are inconclusive or abnormal are to be subject to clinical interview by a "qualified psychologist or psychiatrist." Further:

> Clinical interviews serve as a means of *professionally evaluating the results* of the personality tests, gathering further information on an individual's behavioral reliability, and observing a limited sample of the individual's behavior. The proposed rule requires that the clinical interview, when required, be done by a qualified and, if applicable, state-licensed psychologist or psychiatrist. The use of a qualified professional will help assure that an individual is not subject to an arbitrary and capricious decision by a supervisor.

*Id.* It is absolutely clear from this proposal that the psychological testing and evaluation is to be done by professional standards wholly independent of governmental direction. Plaintiffs Hassard and Schofield do not allege that their psychological tests were evaluated by a standard of decision prescribed by the NRC. The parallel to *Blum* is so apparent that the claim of governmental action may properly be characterized as wholly insubstantial. We therefore affirm that part of the district court's decision that finds no governmental action in PG & E's denial of access on the basis of personality test results.

■ Determining whether a private party is a governmental actor, however, is a "necessarily fact-bound inquiry." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982). The case of plaintiff Mathis is bound by different facts. Mathis alleged that, while he was employed by a contractor for PG & E in 1985, PG & E instituted an undercover investigation of narcotics activities by employees at Diablo Canyon. He contends that he was importuned by an undercover

---

**3.** The standards for determining whether an action is governmental are the same whether the purported nexus is to the state or to the federal government. *Kitchens v. Bowen,* 825 F.2d 1337, 1340 (9th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988).

agent to procure marijuana, but refused. At the conclusion of the investigation in June of 1985, Mathis was interviewed by management representatives of his employer and PG & E concerning drug activities, which he denied. One day later, he was denied access by PG & E for security reasons, without notice or hearing.

Mathis contends that his denial of access by PG & E was directed or encouraged by the NRC pursuant to its Fitness for Duty program. This program, too, was the subject of a proposed rule, announced in 1982.[4] Fitness for Duty, 47 Fed.Reg. 33980 (1982). The rule required each licensee to establish adequate written procedures to ensure that employees on duty are not under the influence of alcohol or using drugs in a way to endanger the safety of the facilities. *Id.* at 33981. Mathis alleged on information and belief that "the proposed rules were not formally adopted because the nuclear power industry, including PG & E, and the NRC agreed that nuclear licensees would subject those who have access to nuclear facilities to careful scrutiny for drug involvement without the necessity of NRC adoption of additional formal regulations." He also alleges that the NRC exercised "coercive power and provided significant encouragement" to its licensees to deny access to drug abusers.

Some support for Mathis' allegation of negotiations between the industry and the NRC over control of drug abuse in nuclear facilities is provided by the NRC's notice withdrawing the proposed rule, published in 1968 after access was denied to Mathis. Fitness for Duty, 51 Fed.Reg. 27872 (1986). There the NRC stated that it was deferring action "to encourage the initiatives concerning fitness for duty being taken by the nuclear power industry." *Id.* The NRC stated that it would "exercise this deference as long as the industry programs produce the desired results." *Id.* In its policy statement published at the same time, the NRC reiterated this warning. Policy statement, Fitness for Duty, 51 Fed.Reg. 27921 (1986). The NRC further stated:

By way of further guidance to licensees, Commission expectations of licensee programs for fitness for duty of nuclear power plant personnel may be summarized as follows:

° It is Commission policy that the sale, use, or possession of alcoholic beverages or illegal drugs within protected areas at nuclear plant sites is unacceptable.

\*     \*     \*     \*     \*     \*

° An acceptable fitness for duty program should at a minimum include the following essential elements:

(1) A provision that the sale, use, or possession of illegal drugs within the protected area will result in immediate revocation of access to vital areas and discharge from nuclear power plant activities . . . .

(2) A provision that any other sale, possession, or use of illegal drugs will result in immediate revocation of access to vital areas, mandatory rehabilitation prior to reinstatement of access, and possible discharge from nuclear power plant activities.

\*     \*     \*     \*     \*     \*

*Id.* at 27922. The statement goes on to remind licensees that "the NRC's decision to use discretion in enforcement to recognize industry initiatives in no way changes the NRC's ability to issue orders, call enforcement meetings, or suspend licenses should a significant safety problem be found." *Id.*

It is true, as we have said, that this policy statement was not published until about a year after Mathis was denied access, but he has alleged pressures from the NRC prior to publication. The question is whether the NRC's involvement was sufficient "that the choice must in law be deemed to be that of the government." *San Francisco Arts & Athletics Inc. v. Olympic Committee,* 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987). At least by 1986, there is little question

---

**4.** The NRC has recently promulgated very extensive Fitness for Duty regulations, that apply to employees of contractors as well as those of licensees. Fitness for Duty Program, 54 Fed. Reg. 24468–508 (1989).

that the NRC was not shrinking from suggesting a standard of decision for the exclusion of illegal drug users from access to protected areas.[5] The approach is quite different from that used by the NRC in relation to personality testing; there is no deference here to decisionmaking by qualified professionals according to standards independent of the government. The minimum standard is stated by the NRC, as a minimum acceptable industry plan, backed up by threats of enforcement or of formal rulemaking. There is no parallel to *Blum*.[6]

In light of this bare record, we cannot agree with the conclusion that Mathis' allegations of governmental coercion or encouragement are frivolous or wholly without substance. The mere fact that PG & E might have been willing to act without coercion makes no difference if the government did coerce. *Carlin Communications Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir.1987), *cert. denied*, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988). If Mathis can prove his allegations that in 1985 the NRC was maintaining an informal policy equivalent to the policy it published in 1986, he may be able to establish that PG & E's action can "be ascribed to a governmental decision."[7] *Lugar*, 457 U.S. at 938, 102 S.Ct. at 2754. We conclude that he should be given that opportunity. We therefore reverse the or-

der of the district court dismissing Mathis' claim for lack of subject matter jurisdiction.

## CLAIM AGAINST THE NRC; EXHAUSTION

■ Plaintiffs also appeal the district court's dismissal of their claim against defendant NRC for failure to exhaust administrative remedies. NRC regulations provide that interested parties may seek to have the NRC promulgate rules concerning the obligations of nuclear power plant licensees. 10 C.F.R. § 2.801, (1989). Final actions (including the refusal to act) are reviewable by the Courts of Appeal under 42 U.S.C. § 2239(b).

■ In the absence of a statutory requirement of exhaustion, a district court is not precluded from entertaining challenges to administrative action even though some administrative remedies remain available and unused. *See Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466–67, 45 L.Ed.2d 522 (1975), *Aleknagik Natives Ltd. v. Andrus*, 648 F.2d 496, 499–500 (9th Cir. 1980). We will not, however, disturb a district court's determination whether exhaustion is required unless there has been a clear abuse of discretion. *United Farm Workers v. Ariz. Agr. Employment Relations Bd*, 669 F.2d 1249, 1253 (9th Cir.

---

5. It is true that the NRC has also proposed or urged that licensees provide fair notice and hearing procedures for employees denied access. *See* Access Authorization Program, 49 Fed.Reg. 30726, 30728–29 (1984). PG & E's failure to yield to this influence, however, does not render it logically impossible for PG & E to have yielded to federal pressure to discharge employees suspected of illegal use or sale of drugs. And if the denial of access to Mathis was coerced by government, then a right to hearing follows, if the remaining elements of a violation of due process are established. *E.g., North Georgia Finishing, Inc. v. Di–Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).

6. In *Blum*, the Court observed "[The inmates] argue that the State 'affirmatively commands' the summary discharge or transfer of Medicaid patients who are thought to be inappropriately placed in their nursing facilities. Were this characterization accurate, we would have a different question before us." *Blum*, 457 U.S. at 1005, 102 S.Ct. at 2786.

7. PG & E contends that the NRC policy clearly does not specify that PG & E must decide that Mathis himself is an illegal drug user. We cannot read that narrow a meaning into the Supreme Court's statement in *Blum* that the state's regulations do not "demonstrate that the State is responsible for the decision to discharge or transfer particular patients." *Blum*, 457 U.S. at 1008, 102 S.Ct. at 2788. State coercion will almost never be directed toward specific individuals that the State does not know. The Supreme Court's point was made in the sentence that follows: "Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* The crucial question is whether the government or someone independent of the government provides the "rule of decision." *Rendell–Baker v. Kohn*, 457 U.S. 830, 843, 102 S.Ct. 2764, 2772–73, 73 L.Ed.2d 418 (1982) (White, J., concurring); *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 2257 n. 10, 101 L.Ed.2d 40 (1988).

1982), *Daly–Murphy v. Winston,* 837 F.2d 348, 353–354 (9th Cir.1987). We find no abuse here.

The strongest reason for upholding the district court's decision is the nature of the relief sought by plaintiffs. Plaintiffs are asking the district court to order the NRC to promulgate a rule. The effects of such a rule would necessarily go far beyond the parties and concerns presented by this case. The rulemaking process provided by 42 U.S.C. § 2239(a), and 10 C.F.R. Part 2, allows for interested parties to have a full opportunity to participate. The district court was correct in choosing not to circumvent that process.[8]

Plaintiffs contend that their action raises constitutional issues that are inappropriate for resolution by an administrative agency. *See Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 245 (3rd Cir.1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981). But the crafting of a rule or policy providing for fairness to employees while maintaining safety in the nuclear industry is one that entails many technical as well as constitutional considerations.

The plaintiffs' contend that to seek rule making would be futile and cause them irreparable harm. The futility and harm, however, are speculative. As we have indicated, the NRC has seriously considered promulgating a rule for regulating the access of contractors' employees. Where it has regulated, as in the case of licensees' direct employees, the NRC has supported due process hearings. 10 C.F.R. Parts 10 and 11. This is not a case where the agency's "established position render[s] administrative review meaningless as a practical matter". *Aleknagik Natives Ltd. v. Andrus,* 648 F.2d 496, 500 (9th Cir.1980). Nor do we find that the prospect of delay outweighs the advantages of administrative attention in the first instance. The district

court therefore acted well within its discretion in requiring exhaustion.

CONCLUSION

We affirm the district court's dismissal of plaintiffs Hassard's and Schofield's claims against PG & E, and the dismissal of all the claims against the NRC, as well as all claims pendent to those claims. We reverse the district court's dismissal of plaintiff Mathis' claim against PG & E, along with claims pendent to it, and remand these claims to the district court for proceedings consistent with this opinion. The dismissal of the union plaintiffs' claims against PG & E is reversed to the extent that those claims pertain to the claim of plaintiff Mathis or those similarly situated to him. The judgment of the district court is AFFIRMED in part, and REVERSED in part, and the case is REMANDED. Parties will bear their own costs.

O'SCANNLAIN, Circuit Judge, concurring and dissenting:

I generally concur in the court's opinion, but I respectfully dissent from that portion which reverses the district court's order dismissing Mathis's claim for lack of subject-matter jurisdiction.

In my view, the dismissal was proper because Mathis has not shown that the NRC "is *responsible* for the specific conduct of which [he] complains." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (emphasis in original). Mathis relies upon an NRC policy statement which was published one year *after* he was denied access to Diablo Canyon. While Mathis has alleged pressures from the NRC prior to publication, such pressures, even if proven, do not rise to the level of governmental "coercion" or "responsibility" which is required under established Supreme Court precedents. *See id.; Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Because I find no governmental

8. The NRC argues very forcefully that the system of judicial review of rulemaking established by Congress, which provides for review of NRC rulemaking directly by the courts of appeals, 28 U.S.C. § 2342(4), precludes the district court from exercising any jurisdiction over plaintiffs'

claim against the NRC. *See Public Utility Com'r of Oregon v. Bonneville Power Administration,* 767 F.2d 622, 627 (9th Cir.1985). Our disposition makes it unnecessary for us to address this contention.

action, I believe the district court was correct in dismissing Mathis's claim for lack of subject matter jurisdiction.